**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMERSON BRADLEY, individually,
and on behalf of all others similarly situated,

     Plaintiff,

v.                                CASE NO.:

UNITED STATES DEPARTMENT OF
EDUCATION,

     Defendant.

**CLASS ACTION COMPLAINT**

Plaintiff EMERSON BRADLEY ("Plaintiff"), on behalf of himself and all others similarly

situated, by Counsel, and as for his Complaint against Defendant, **THE UNITED STATES**

**DEPARTMENT OF EDUCATION** (the "Department" or "Defendant")f), states as follows:

**I.     NATURE OF THE ACTION**

1.     This Complaint seeks to enforce the Privacy Act of 1974, 5 U.S.C. § 552a, (the

"Privacy Act"), which "establishes a code of fair information practices that governs the collection,

maintenance, use, and dissemination of information about individuals that is maintained in systems

of records by federal agencies."[1]

2.     Plaintiff, individually and on behalf of the class members, seeks actual damages for

the Department's willful and intentional violations of the Privacy Act.

3.     Student loans are a ubiquitous, often burdensome, reality in American society; over

43 million Americans carry federal student loan debt totaling $1.59 trillion as of the second quarter

of this year.[2]

---

[1] https://www.justice.gov/opcl/privacy-act-1974 (last accessed on Nov. 1, 2022)
[2] https://www.newyorkfed.org/microeconomics/topics/student-debt (last accessed on Nov. 1, 2022).

4.      Many Americans carry this debt burden for years before they can fully pay off their student loans, that is if they are ever able to pay off these loans at all.

5.      Despite the serious economic consequences of student loans, it is remarkably easy to obtain one or obligate another individual as a co-signer.

6.      Often all that is required is to simply fill out an application online with some personal details about the borrower and any co-signer, even without the borrower and co-signer's knowledge or consent.

7.      Consequently, thousands of Americans have been shocked to discover the federal government claims they are personally responsible on student loans they know nothing about and to which they never agreed.[3]

8.      The Department maintains records for all such federal student loans, including the original application information.

9.      The Department does not even require information to be submitted directly from the obligor on a student loan, as simply anyone can fill out the requisite forms as long as they have the right information available. Because most Americans have "experienced or been notified of a significant data breach pertaining to their personal data or accounts," fraudsters find it easy to secure bogus student loans from the Department with stolen personal identifiable information (PII).

---

[3]      FTC Consumer Sentinel Data Book 2019, available at https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2019/consumer_sentinel_network_data_book_2019.pdf (noting over 14,000 reports of identity theft with federal student loans in 2019, marking a 188% increase in such reports from the previous year) (last accessed on Nov. 1, 2022); FTC Consumer Sentinel Data Book 2020, https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2020/csn_annual_data_book_2020.pdf (noting nearly 27,500 reports of identity theft with federal student loans in 2020, marking an 88% increase in such reports from the previous year) (last accessed on Nov. 1, 2022)

10.     As evidenced by the tens of thousands reports of identity theft with student loans, Defendant has failed to maintain a system with accurate records and adequate identity verification protocols, resulting in financial stress and confusion and pecuniary harm for countless Americans.

11.     Senator Sam J. Ervin, Jr. expounded upon the need for the Privacy Act when he introduced the Senate version (S. 3418):

> [T]he effect the effect on the right to privacy of massive information-gathering and dissemination through the use of sophisticated computer technology is just beginning to be realized. Rich or poor, male or female, whatever one's cultural style or religious or political views, each of us is subject to cumulative records being stored by a variety of Government agencies and private organizations.

> One of the most obvious threats the computer poses to privacy comes in its ability to collect, store, and disseminate information without any subjective concern for human emotion and fall[i]bility.

> Yet the increasing growth of information-gathering by Government and private organizations proceeds without any standards or procedures to regulate these organizations. It is because of this vacuum of authority that I am introducing, along with the very distinguished ranking minority member, Senator Percy, this bill which is essential in order to preserve individual freedoms. We must act now to create safeguards against the present and potential abuse of information about people. I would like to provide a brief summary of its provisions.

12.     120 Cong. Rec. at 40, 6, (1974), *reprinted in* Privacy Act Source Book, at 14, available at   https://www.justice.gov/opcl/paoverview_sourcebook (last accessed on Nov. 1, 2022).

13.     Congress intended to protect individuals like Plaintiff and the class members when it passed the Privacy Act, as the Department falsely accuses them of owing debts to the federal government which resulted from fraud. The Department enabled this fraud through its knowing failure to ensure the integrity and accuracy of information collected, stored, maintained, and disseminated about Plaintiff and the class members.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to the Privacy Act under 5 U.S.C. 552a(g)(1)(D) and 28 U.S.C. § 1331.

15.     Venue is proper in this district pursuant to 5 U.S.C. § 552a(g)(5).

### III.     PARTIES

16.     Plaintiff is a natural person and a citizen of the United States.

17.     At all times relevant, Plaintiff was an active-duty service member with the United States Army, serving as a Staff Sergeant in the 82nd Airborne Division.

18.     The Department is an agency as defined by 5 U.S.C. § 552a(a)(1).

### IV.     FACTS

*The Department Enables Fraudsters to Steal Hundreds of Millions of Dollars
and Saddle Innocent Americans with Fraudulent Student Loan Debt*

19.     In September 2011, the Department's Office of Inspector General ("OIG") issued an Investigative Program Advisory Report titled *Distance Education Fraud Rings* "to alert Federal Student Aid (FSA) and the Office of Postsecondary Education (OPE) to a serious fraud vulnerability in distance education programs and to make recommendations which, if implemented, would mitigate future additional risks of fraud in Title IV[4] programs."[5] This report noted:

> Over the past six years, OIG has responded to a dramatic increase in fraud in these programs. Education programs that are delivered solely through the Internet present unique opportunities for fraud and challenges for oversight, because Title IV programs were designed primarily to deliver aid to students who are physically present in traditional classrooms, rather than alternative on-line environments. All

---

[4] Title IV of the Higher Education Act of 1965 authorizes student financial assistance programs "provid[ing] grant, work-study, and loan funds to students attending college or career school." Federal Student Aid, *About Us*, available at https://studentaid.gov/about (last accessed on Nov. 1, 2022).

[5] Control No. ED-OIG/L42-L0001 at 3 (Sept. 26, 2011), available at https://www2.ed.gov/about/offices/list/oig/invtreports/l42l0001.pdf (last accessed on Nov. 1, 2022).

aspects of the application for admission and student financial aid and the delivery of instruction take place through the Internet, and students are not required to present themselves in person at any point. Because institutions offering distance education—like all Title IV institutions—are not required to verify prospective and enrolled students' identities, ringleaders can easily use others' identities (with or without their consent) to obtain Title IV funds. The Department's Title IV regulations and application systems also do not require the verification of identity and can be exploited to cause improper delivery of Title IV funds.

*Id.*

20.     In early 2013, OIG issued a Final Management Information Report acknowledging that "school-based student aid fraud ring activity is a rapidly growing problem."[6] This report provided "FSA and…OPE with the results of [OIG's] risk analysis regarding one type of student aid fraud ring activity associated with the electronic processing of Federal student aid applications." *Id.* The risk analysis "identified a total of over 85,000 recipients who may have participated in this type of student aid fraud ring activity and who received of $874 million in Federal student financial aid…during the period AY 2009 through AY 2012." *Id.*

21.     Student aid fraud, much of it perpetrated by stealing the identities of innocent Americans, has continued unabated since these reports from OIG.

22.     A review of OIG's "Just Issued" audit, investigation, and other reports reveals the following:

A.     "A Danville, Virginia woman, who used the personal identifying information of others to submit and received fraudulent student loans, pled guilty this week in federal court."[7]

---

[6] *Student Aid Fraud Ring Assessment*, Control No. ED-OIG/X18M0001 at 1 (Jan. 17, 2013), available at https://www2.ed.gov/about/offices/list/oig/auditreports/fy2013/x18m0001.pdf (last accessed on Nov. 8, 2022).

[7] *Karen Warren Received More than $260,00 in Fraudulent Loans*, U.S. Attorney's Office—W.D. Va. (Nov. 4, 2022), available at https://www.justice.gov/usao-wdva/pr/danville-woman-pleads-guilty-student-loan-fraud (last accessed on Nov. 8, 2022).

B.      "According to court documents, [Robert] John conspired with others  to submit fraudulent applications for student loans and grants to two local community colleges, using the names of seven different applicants. In total, the Department of Education paid over $74,000 in loan and grant funds in connection with the fraudulent applications."[8]

C.      "A 39-year-old Richmond resident has been charged with fraudulently obtaining nearly $600,000 in financial aid funds at several Texas colleges and universities….[Emmanuel] Finnih used the personal identifiers of other individuals to prepare, submit and sign false and fraudulent financial aid applications and master promissory notes in their names, according to the indictment."[9]

D.      "Sandra Anderson, 63, of Palmetto, Georgia; Yolanda Thomas, 51, of Columbus, Georgia; Leo Thomas, 56, of Phenix City, Alabama; Kristina Parker, 35, of Stone Mountain, Georgia; and their co-conspirators fraudulently obtained millions of dollars in federal financial aid funds that they misused for their personal benefit. They did so by creating an elaborate sham university—the Columbus, Georgia, satellite campus of the Apex School of Theology."[10]

---

[8] *St. Bernard Parish Man Admits to Student Aid Fraud of Over $74,000*, U.S. Attorney's Office—E.D. La. (Oct. 6, 2022), available at https://www.justice.gov/usao-edla/pr/st-bernard-parish-man-admits-student-aid-fraud-over-74000 (last accessed on Nov. 8, 2022).
[9] *Local Man Indicted for Student Financial Aid Fraud*, , U.S. Attorney's Office—S.D. Tex. (Oct. 3, 2022), available at https://www.justice.gov/usao-sdtx/pr/local-man-indicted-student-financial-aid-fraud (last accessed on Nov. 8, 2022).
[10] *Four Individuals Plead Guilty in Multimillion-Dollar Scheme to Defraud U.S. Department of Education Federal Financial Aid Programs*, U.S. Department of Justice (Sept. 29, 2022), available at https://www.justice.gov/opa/pr/four-individuals-plead-guilty-multimillion-dollar-scheme-defraud-us-department-education (last accessed on Nov. 8, 2022).

E.      "A Jacksonville[, North Carolina] man pleaded guilty yesterday to using identities of family members, drug addicts and homeless people to steal over a quarter of a million dollars in federal student aid funds."[11]

23.     Despite knowing for years that blameless victims have been saddled with fraudulent student loans through identity theft, Defendant has time and time again violated the Privacy Act by failing to implement protocols to ensure it obtains student loan application directly information from the purported applicant or to correct inaccurate information about victims in its information systems once these victims notify Defendant of their victimization by identity thieves.

### Defendant Approves Numerous Facially Fraudulent Co-Signer Applications in Plaintiff's Name

24.     Starting in or around April 2012, fraudulent applications were submitted to the Department that falsely represented that Plaintiff agreed to endorse a series student loans as co-signer (the "Fraudulent Loans").

25.     On or about April 11, 2012, Plaintiff's father, Lars D. Bradley ("Lars Bradley"), forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "April 2012 Addendum") in the amount of $36,000 for purported use to fund graduate education at Walden University, an online, for-profit school. The April 2012 Addendum bore multiple hallmarks of identity theft:

A.      It listed Plaintiff's permanent address as a P.O. Box in San Diego, California.

B.      It listed Plaintiff's e-mail address as "LARSBRADLEY@ATT.NET."

---

[11] *Jacksonville Man Pleaded Guilty to Student Aid Fraud and Possessing Firearm in Furtherance of Drug Trafficking Offense*, U.S. Attorney's Office—E.D.N.C. (Apr. 22, 2022), available at https://www.justice.gov/usao-ednc/pr/jacksonville-man-pleaded-guilty-student-aid-fraud-and-possessing-firearm-furtherance (last accessed on Nov. 8, 2022).

C.      It identified Plaintiff's personal telephone number as 858-201-1312, a telephone number never used or associated with Plaintiff.

D.      It identified Plaintiff as employed by the U.S. Navy while listing his work telephone number as 1-800-709-6205, a telephone number never associated with the U.S. Navy and in fact associated with a Portuguese to English translation service.

E.      It purported to obligate Plaintiff, days after his twenty-first birthday, as a co-signer for a $36,000 graduate school loan for his fifty-six-year-old father.

F.      It was submitted in connection with education at a distance education institution, and these institutions are a well

26.     On or about July 31, 2012, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "July 2012 Addendum") in the amount of $38,000 for purported use to fund graduate education at Walden University. The July 2012 Addendum bore multiple hallmarks of identity theft:

A.      It again listed Plaintiff's permanent address as a P.O. Box in San Diego, California.

B.      It provided no e-mail address for Plaintiff.

C.      It again identified Plaintiff's personal telephone number as 858-201-1312.

D.      It again identified Plaintiff as employed by the U.S. Navy while listing his work telephone number as 1-800-709-6205.

E.      It omitted the state of Plaintiff's driver's license.

F.      It purported to obligate Plaintiff as a co-signer for a $38,000 graduate school loan for his now fifty-seven-year-old father, a mere three months after he purportedly obligated himself as a co-signer to a nearly identical loan for $36,000.

27.     On or about July 8, 2013, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "July 2013 Addendum") in the amount of $37,000 for purported use to fund graduate education at Walden University. The July 2013 Addendum bore multiple hallmarks of identity theft:

A.      It again listed Plaintiff's permanent address as a P.O. Box in San Diego, California.

B.      It provided no e-mail address for Plaintiff.

C.      It identified Plaintiff's personal telephone number as 619-272-4241, a telephone number never used or associated with Plaintiff. This telephone number is associated with a Portuguese to English translation service.

D.      It again identified Plaintiff as employed by the U.S. Navy while listing his work telephone number as 1-800-709-6205.

E.      It purported to obligate Plaintiff as a co-signer for a $37,000 graduate school loan for his now fifty-eight-year-old father, after he purportedly obligated himself as a co-signer to nearly identical loans for $38,000 and $36,000.

28.     On or about June 10, 2014, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "June 2014 Addendum") in the amount of $36,000 for purported use to fund graduate education at Walden University. The June 2014 Addendum bore multiple hallmarks of identity theft:

A.      It again listed Plaintiff's permanent address as a P.O. Box in San Diego, California.

B.      It provided no e-mail address for Plaintiff.

C.      It again identified Plaintiff's personal telephone number as 619-272-4241.

D.     It again identified Plaintiff as employed by the U.S. Navy while listing his work telephone number as 1-800-709-6205.

E.     It purported to obligate Plaintiff as a co-signer for a $36,000 graduate school loan for his now fifty-nine-year-old father, after he purportedly obligated himself as a co-signer to nearly identical loans for $38,000, $37,000, and $36,000.

29.     On or about September 10, 2014, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "September 2014 Addendum") in the amount of $36,000 for purported use to fund graduate education at Walden University. The September 2014 Addendum bore multiple hallmarks of identity theft:

A.     It provided no e-mail address for Plaintiff.

B.     It again identified Plaintiff's personal telephone number as 619-272-4241.

C.     It purported to obligate Plaintiff as a co-signer for a $36,000 graduate school loan for his now fifty-nine-year-old father, after he purportedly obligated himself as a co-signer to nearly identical loans four times with an outstanding co-signed balance of $147,000.

30.     On or about July 8, 2016, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "July 2016 Addendum") in the amount of $39,000 for purported use to fund graduate education at Walden University. The July 2016 Addendum bore multiple hallmarks of identity theft:

A.     It provided no e-mail address for Plaintiff.

B.     It again identified Plaintiff's personal telephone number as 619-272-4241.

C.     It purported to obligate Plaintiff as a co-signer for a $39,000 graduate school loan for his now sixty-one-year-old father, after he purportedly obligated himself as a co-

signer to nearly identical loans four times with an outstanding co-signed balance of $183,000.

31.     On or about August 31, 2017, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "August 2017 Addendum") in the amount of $40,000 for purported use to fund graduate education at Walden University. The August 2017 Addendum bore multiple hallmarks of identity theft:

      A.     It listed the same address in San Diego, CA as Lars Bradley and Plaintiff's permanent address.

      B.     It provided Lars Bradley's e-mail address, portuguesetranslator@icloud.com, as Plaintiff's e-mail address.

      C.     It again identified Plaintiff's personal telephone number as 619-272-4241.

      D.     It listed "N/A" as the name of Plaintiff's employer.

      E.     It purported to obligate Plaintiff as a co-signer for a $40,000 graduate school loan for his now sixty-three-year-old father, after he purportedly obligated himself as a co-signer to nearly identical loans six times with an outstanding co-signed balance of $222,000.

32.     On or about August 14, 2018, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "August 2018 Addendum") in the amount of $40,000 for purported use to fund graduate education at Walden University. The August 2018 Addendum bore multiple hallmarks of identity theft:

      A.     It again listed the same address in San Diego, CA as Lars Bradley and Plaintiff's permanent address.

      B.     It again provided Lars Bradley's e-mail address,

portuguesetranslator@icloud.com, as Plaintiff's e-mail address.

C.      It again identified Plaintiff's personal telephone number as 619-272-4241.

D.      It again listed "N/A" as the name of Plaintiff's employer.

E.      It purported to obligate Plaintiff as a co-signer for a $40,000 graduate school loan for his now sixty-three-year-old father, after he purportedly obligated himself as a co-signer to nearly identical loans five times with an outstanding co-signed balance of $262,000.

33.     In less than five months in 2019, Lars Bradley forged and fraudulently submitted three Endorser Addenda for a Federal Direct Plus Loan (the "2019 Addenda") for a total of $140,000 for purported use to fund graduate education at Capella University, another online, for-profit school. Setting aside the improbability of Plaintiff agreeing to co-sign $140,000 of graduate school loans for his sixty-four-year-old father in one year, the 2019 Addenda bore multiple hallmarks of identity theft:

A.      Each addendum listed the same address in San Diego, CA as Lars Bradley and Plaintiff's permanent address.

B.      Each addendum again provided Lars Bradley's e-mail address, portuguesetranslator@icloud.com, as Plaintiff's e-mail address.

C.      Each addendum again identified Plaintiff's personal telephone number as 619-272-4241.

D.      Each addendum again listed "N/A" as the name of Plaintiff's employer.

E.      The addenda purported to obligate Plaintiff as a co-signer for $140,000 in graduate school loans for his retirement age father, after he purportedly obligated himself as a co-signer to nearly identical loans six times, for an outstanding co-signed balance of

$302,000.

34.     On or about June 23, 2020, Lars Bradley forged and fraudulently submitted an Endorser Addendum for a Federal Direct Plus Loan (the "June 2020 Addendum") in the amount of $50,000 for purported use to fund graduate education at Capella University. The August 2017 Addendum bore multiple hallmarks of identity theft:

        A.     It again listed the same address in San Diego, CA as Lars Bradley and Plaintiff's permanent address.

        B.     It again provided Lars Bradley's e-mail address, portuguesetranslator@icloud.com, as Plaintiff's e-mail address.

        C.     It again identified Plaintiff's personal telephone number as 619-272-4241.

        D.     It again listed "N/A" as the name of Plaintiff's employer.

        E.     It purported to obligate Plaintiff as a co-signer for a $50,000 graduate school loan for his retirement age father, after he purportedly obligated himself as a co-signer to nearly identical loans nine times with an outstanding co-signed balance of $442,000.

35.     Plaintiff has never borrowed money through a federal student loan program, nor cosigned on any federal student loans.

### *Plaintiff Learns of Fraudulent Student Loan Endorsements and Attempts to Clear His Name*

36.     Plaintiff did not become aware of any of the Fraudulent Loans until after December 2020 when he was denied a credit card.

37.     Plaintiff had not received any prior notice of the Fraudulent Loans.

38.     After Plaintiff was denied credit, he investigated and discovered the Fraudulent Loans.

39.     Plaintiff was denied credit because of records pertaining to the Fraudulent Loans

that Defendant reported about him to consumer reporting agencies, as defined by 15 U.S.C. § 1681a(f).

40.    Prior to suffering a credit denial based on Defendant's false credit reporting, Plaintiff had received no communications from Defendant concerning the Fraudulent Loans. Defendant sent any and all communications pertaining to the Fraudulent Loans to mailing addresses and e-mail addresses supplied by Lars Bradley, and Plaintiff never received or accessed any communications at these addresses.

41.    On or around May 8, 2021, Plaintiff filed a sworn statement attesting that he never endorsed any such loans.

42.    On or around May 11, 2021, Plaintiff filed a police report with the Cumberland County Sheriff's Office in North Carolina, attesting that he was not responsible for the Fraudulent Loans.

43.    On or around May 28, 2021, Plaintiff disputed Fraudulent Loans with Nelnet, who represented that it was servicing the Fraudulent Loans on behalf of Defendant.

44.    As part of this dispute, Plaintiff submitted an affidavit on or around June 22, 2021, to Nelnet again reiterating he had had never endorsed such loans and was instead the victim of identity theft.

45.    Plaintiff also signed a Certification/Agreement of Cooperation for Identity Theft Claims with Defendant around this same time.

46.    On or around July 18, 2021, Plaintiff filed a complaint with the Consumer Financial Protection Bureau concerning the Fraudulent Loans.

47.    On or around August 17, 2021, Plaintiff received an email from Defendant stating that the Department had no record of student loans in his name and directing him to "work directly

with the lender to resolve your concerns."

48.     On or around September 15, 2021, Plaintiff filed an Identity Theft Report with the Federal Trade Commission regarding the Fraudulent Loans.

49.     Around this same time, Plaintiff received a letter from Defendant asserting that he was liable for $341,117.47 relating to the Fraudulent Loans.

50.     Plaintiff submitted to Defendant a Borrower Affidavit of Forgery of an Education Loan Note, again explaining the Fraudulent Loans did not belong to him and he was not responsible for these loans.

51.     Mr. Bradley submitted the above document as well as other supporting documents to Nelnet to dispute the Fraudulent Loans.

52.     Plaintiff disputed the origination of the Fraudulent Loans with the higher education institutions that had received funds from the Department based on the Fraudulent Loans.

53.     In or around October 2021, Plaintiff submitted another dispute to Defendant regarding the Fraudulent Loans, including supporting documentation.

54.     On or around October 20, 2021, Defendant notified Plaintiff that it rejected his claim and that they were still holding him responsible as a co-signer for the Fraudulent Loans .

55.     On or around February 3, 2022, Defendant sent a letter to Plaintiff still refusing to remove him from the Fraudulent Loans and instead requesting additional paperwork.

56.     On or around July 24, 2022, Plaintiff submitted to Defendant a Loan Discharge Application—Forgery regarding the Fraudulent Loans.

57.     Defendant has repeatedly deemed that Plaintiff liable for the Fraudulent Loans, to the detriment of Plaintiff's interests.

58.     In disseminating information about Plaintiff concerning the Fraudulent Loans,

Defendants materially and willfully misrepresented records about Plaintiff that are covered under the Privacy Act.

**COUNT I**
**Violation of the Privacy Act**
**5 U.S.C. §552a**
**Class Claim**

59.     Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

60.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which he is a member and initially defined as:

> All natural persons who (a) submitted an identity theft report under penalty of perjury to Defendant within the two years before the filing of this action; (b) where the identity theft report identified one or more direct student loans as resulting from identity theft; (c) where Defendant did not update its information systems to discharge the person from any obligation on the contested loans within three months of receiving that person's identity theft report.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

61.     **Numerosity**. Plaintiff alleges that the Class is so numerous that joinder of the claims of all class members is impractical. Outstanding student loans total $1.59 trillion as of the second quarter of this year, and thousands of fraudulent student loans are obtained from Defendant by identity thieves every year. Given the common nature of student loan identity theft, the class size will easily exceed hundreds or thousands of consumers. The names and addresses of the class members are identifiable through documents maintained by Defendant, and the class members may be notified of the pendency of this action by publication or mailed notice.

62.     **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class and sub-class members. These questions predominate over the questions affecting only individual members. These common legal and

factual questions include, among other things: (a) whether Defendant employed procedures to comply with the Privacy Act in originating student loans and maintaining Student Loan Information; (b) whether Defendant's conduct constituted a violation of the Privacy Act; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of the Plaintiff and putative class members.

63. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class and sub-class member alleges a violation of the same Privacy Act provisions detailed above. These claims challenge the student loan origination process followed by Defendant and Defendant's policies and procedures for maintaining Student Loan Information and do not depend on any individualized facts. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the class.

64. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and sub-class and has accepted those responsibilities.

65. Certification of the class under Fed. R. Civ. P. 23(b)(3) is also appropriate in that:

A. As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the actual damages sought by each member would

prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

      B.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Privacy Act claims generally are ideal for class treatment as they involve many victimized Americans who are otherwise disempowered and unable to afford to bring their claims individually. Further, most Americans affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one victimized American would set the law for every similarly situated American.

66.    Plaintiff is an "individual" as that term is defined pursuant to 5 U.S.C. § 552a(a)(2).

67.    The Department is an "agency" which "maintained" "records" using a "system of records" as those terms are defined in 5 U.S.C. § 552a(a)(1).

68.    Defendant's information concerning student loans and purported financial responsibility of Americans ("Student Loan Information") like Plaintiff and the class members constitute "records" within a "system of records" as defined under the Privacy Act. 5 U.S.C. § 552a(a)(4)-(5).

69.    Defendant "maintains" this Student Loan Information as defined under the Act. 5 U.S.C. § 552a(a)(3).

70.    Defendant was required to "collect information to the greatest extent practicable directly from" Plaintiff and the class members pertaining to the Student Loan Information since

the information collected may result in adverse determinations about Plaintiffs and class members' rights, benefits, and privileges under Federal programs. 5 U.S.C. § 552a(e)(2).

71.     Defendant was required to maintain all Student Loan Information used by Defendants in making any determination about Plaintiff and class members with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination. 5 U.S.C. § 552a(e)(5).

72.     Defendant was required, prior to disseminating any record concerning Student Loan Information about Plaintiff or class members to any person other than an agency, to make reasonable efforts to assure that such records were accurate, complete, timely, and relevant for agency purposes. 5 U.S.C. § 552a(e)(6).

73.     Defendant was required to establish appropriate administrative, technical, and physical safeguards to ensure the security of Student Loan Information and to protect against threats or hazards to the integrity of this information which could result in substantial harm, embarrassment, inconvenience, or unfairness to Plaintiff  and the class members. 5 U.S.C. § 552a(e)(10).

74.     In many instances, Defendant permits submission of student loan applications electronically over an internet portal without engaging in even rudimentary identity verification efforts. Defendant approves applications for student loans totaling tens of thousands or even hundreds of thousands of dollars without making any effort to verify the identity of the purported applicants and co-signers.

75.     Given the ubiquity of data breaches and identity theft, an "applicant" providing PII to Defendant as part of an application for a student loan submitted electronically in no way establishes the authenticity of that application or the "applicant."

76.     As the Department's Federal Student Aid website freely admits, the Department "regularly receives claims from individuals who contend that they did not sign the promissory note or otherwise request the Federal loan on which the Department is trying to collect."[12]

77.     In August 2021, the Office of the Comptroller of the Currency, along with the other Federal Financial Institutions Examination Council (FFIEC) Members, issued guidance "titled *Authentication and Access to Financial Institution Services and Systems*…to provide financial institutions of effective risk management principles and practices for access and authentication."[13] This guidance "acknowledges significant risks associated with the cybersecurity threat landscape that reinforce the need for financial institutions to effectively authenticate users and customers to protect information systems, accounts, and data." *Id.*

78.     Defendant's authentication efforts in the student loan application process, to the extent they exist at all, have proven woefully inadequate to prevent thousands of Americans from the Department falsely burdening them with debt for which they bear no legal or moral responsibility.

79.     Defendant has compounded the harm inflicted on Americans through its deficient fraud prevention efforts by rejecting countless attempts by innocent victims like Plaintiff to obtain "discharges" of student loans they never even owed through the Department's byzantine administrative discharge process.

80.     Defendant violated numerous Privacy Act requirements by instituting policies and procedures that permitted submission and retention of fraudulent and false Student Loan

---

[12] Federal Student Aid, *New Form for Forgery Loan Discharge Process for ED-held Loans*, available at https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2020-02-12/new-form-forgery-loan-discharge-process-ed-held-loans (last accessed on Nov. 1, 2022).
[13] FFIEC, *Authentication and Access to Financial Institution Services and Systems* at 1, available at  https://www.occ.gov/news-issuances/bulletins/2021/bulletin-2021-36a.pdf (last accessed on Nov. 1, 2022).

Information which misrepresented that Plaintiff and the class members were liable for federal student loans when in fact Plaintiff and the class members never agreed to such obligations.

81.     Defendant disclosed this inaccurate Student Loan Information to third-party servicers, as well as to consumer reporting agencies.

82.     Defendant's disclosure of this information was without Plaintiff or the class members' consent, and this disclosure was not within one of the enumerated exceptions to the anti-disclosure provision under the Privacy Act.

83.     Defendant's disclosure of this information was willful and intentional.

84.     Defendant's actions regarding its policies and procedures to collect and maintain this information were also willful and intentional.

85.     The disclosure of the Student Loan Information had an adverse effect on Plaintiff and the class members. By example only, these adverse effects included harming Plaintiff and the class members' ability to access credit and causing Plaintiff and the class members to expend money and time to detect and contest fraudulent student loan accounts in their names.

86.     Defendants violated the Privacy Act in numerous instances as to Plaintiff and the class members, including but not limited to the following provisions:

A.     **5 U.S.C. § 552a(b):** Disclosing the Student Loan Information to third-parties without receiving a written request or prior written consent from Plaintiff and class members and without a permissible purpose outlined in 5 U.S.C. § 552a(b)(1)-(12);

B.     **5 U.S.C. § 552a(e)(1):** Maintaining Student Loan Information that is not relevant and necessary to accomplish a purpose of the Department designated by statute or executive order of the President;

C.     **5 U.S.C. § 552a(e)(2):** Failing to collect information to the greatest extent

practicable directly from the Plaintiff and class members when the information may result in adverse determinations about their rights, benefits, and privileges under Federal programs;

D.     **5 U.S.C. § 552a(e)(5):** Failing to maintain Student Loan Information in with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to Plaintiff and the class when making Department determinations about Plaintiff and the class members;

E.     **5 U.S.C. § 552a(e)(6):** Disseminating Student Loan Information about Plaintiff and the class members without making reasonable efforts to assure that such records are accurate, complete, timely, and relevant for Department purposes; and

F.     **5 U.S.C. § 552a(e)(10):** Failing to establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of Student Loan Information and to protect against anticipated threats or hazards to the security and integrity of Student Loan Information which could result in substantial harm, embarrassment, inconvenience, and unfairness to Plaintiff and the class members.

87.     Plaintiff and class members' damages are a direct and proximate result of Defendant's violations of 5 U.S.C. §552a.

88.     Plaintiff and the class members have been harmed and suffered actual damages (as defined by the Privacy Act) by Defendant's violations of the Privacy Act, including:

A.     Money and time expended to detect and contest false Student Loan Information.

B.     Loss of use and access to credit.

C.     Money and time expended to order credit reports.

D.      Money and time expended to dispute false Student Loan Information published in their credit reports.

E.      Impairment of their credit scores, ability to borrow, and ability to obtain credit.

89.     At all times relevant to this Complaint, Defendant acted in a manner that was willful and intentional.

90.     As a direct and proximate cause of Defendant's violations, Plaintiff and the class members are entitled to actual damages not less than $1,000 per violation of the Privacy Act. 5 U.S.C. § 552a(g)(2)(A), (g)(4)(A).

91.     Plaintiff and the class members are entitled to reasonable attorneys' fees and costs. 5 U.S.C. § 552a(g)(2)(B), (g)(4)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment against Defendant; for class certification as pleaded; for actual damages of not less than $1,000 for himself and each member of the Classes described above; for equitable and injunctive relief; and for attorneys' fees and costs and such other specific or general relief the Court finds just and appropriate.

Respectfully submitted

**EMERSON BRADLEY**

By:____/s/ Leonard A. Bennett_____

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com

Drew D. Sarrett *(pro hac vice forthcoming)*
Kevin a. Dillon *(pro hac vice forthcoming)*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 East Broad Street, Suite 300
Richmond, VA 23219
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: drew@clalegal.com
Email: kevin@clalegal.com


*Attorneys for SPC Bradley, and on behalf of all others similarly situated*